STATE ex rel BOTKIN, Plaintiff, v. MORRISON, Secretary of State, Defendant.

(249 N. W. 563.)

(File No. 7582. Opinion filed June 30, 1933.)

*M. Q. Sharpe,* of Kennebec, and *E. E. Wagner,* of Pierre, for Plaintiff.

*Walter Conway,* Attorney General, and *R. F. Drewry* and *T. E. Eastman,* Assistant Attorneys General, for Defendant.

ROBERTS, J.   This is an original proceeding in mandamus to compel the secretary of state to receive and file a petition for the referendum of chapter 184, Laws 1933, being an act entitled, "An Act Imposing a Tax on Gross Incomes, Providing Generally for the Levy, Assessment, Collection and Distribution Thereof; for Regulatory Measures for the Enforcement of the Act, Providing for Exemptions, Imposing Penalties for Violations of the Provisions of the Act, and Repealing Section 7922 of the 1919 Revised Code of South Dakota, and Chapter 107 of the Session Laws of South Dakota of 1919."

The respondent declined to file the petition.   An alternative writ of mandamus having been issued, the Attorney General appeared on behalf of the respondent, moved to quash the alternative writ, and demurred to the complaint and affidavit of the relator on the ground that no facts were stated sufficient to constitute a cause of action or to entitle relator to relief by way of mandamus or otherwise.

The one question to be determined is whether this legislative . enactment is subject to referendum.   Within the exceptions to the right of referendum are, first, such laws as are declared by the act itself to be necessary for the immediate preservation of the public peace, health, or safety of the state; and, second, such laws as are necessary for the support of the state government and its existing public institutions.   Section 1, article 3, state Const.; Hodges v. Snyder, 43 S. D. 168, 178. N. W. 575.   The act under consideration imposing a tax on gross incomes and providing that a portion of collections therefrom shall be credited to the general fund and the balance to the interest and income common school fund of the state is concededly for the support of the state and its existing

public institutions, but the relator contends, relying upon the decision of this court in State ex rel Wegner v. Pyle, 55 S. D. 269, 226 N. W. 280, that the act is not necessary for such purpose. In that case the question of whether an act providing for a registry tax on motor vehicles was excepted from the reserved right of referendum was considered. The act expressly provided that the levy against real and personal property shall be reduced in proportion to the amount of tax collected under such statute. This court held that the act being designed to shift a portion of the general property tax for use of the general fund to purchasers of automobiles was not necessary for the support of the state government; that the test in determining whether or not a law is necessary for such purpose is what will be the effect on the state if the law is suspended until a vote can be taken or what will be the effect if it is finally defeated; that while the act was intended to raise revenue, and the support of the government is dependent upon revenue, it did not purport to increase revenue. but expressly provided that it should not do so; and that the actual support of the government would be unaffected by the delay or possible defeat of the measure rendering the act subject to the referendum.

Section 1, chapter 185, Laws of 1933, reads as follows: "It is hereby expressed as the intent of the legislature that the entire income derived from the tax on Gross Incomes imposed by the provisions of Senate Bill No. 101 passed at this session of the legislature and approved by the Governor on ——— 1933 [chapter 184, Laws 1933], shall, in its distribution and use, operate as a direct relief, replacement and reduction in the tax heretofore, now and hereafter imposed upon and against the taxable property of the state, and the authorities having supervision of the levying of property taxation are specifically directed and required to eliminate or reduce property tax levies to the full extent of the revenues made available by the collection of the tax imposed by said act."

The argument of the relator is that by reason of this statutory provision no additional revenues will be collected and that within the holding of this court in the Pyle Case the tax statute under consideration is not necessary for the support of the state government. The effect of the section quoted cannot be distinguished in any controlling particular from the replacement section considered in that case.

The declaration in the Pyle Case that the presence of a so-called replacement provision in a revenue measure in itself establishes the fact in every instance that the act merely provides for a shift of the tax burden and that the support of the state government will be unaffected is unsound. Though an act may not be intended to produce additional revenues, facts and circumstances nevertheless may render the enactment of such a revenue measure necessary for the support of the state government. The Legislature is presumed to have determined the facts and may have concluded that by reason of the present economic conditions the burden upon general property must be partially relieved. If a point has been attained where present levies are burdensome and cause defaults in tax payments and sales of realty and personalty for taxes result, the necessity may not consist in securing additional revenue, but in maintaining existing amounts and preventing a shriveling of present sources of revenue. Opportunity is afforded the Legislature and it must be conclusively presumed that it availed itself of such opportunity to determine the facts, and by the determination of such facts and the passage of the law it has determined the question of necessity for itself in the affirmative. For this court the question is not one of wisdom or expediency of legislation. Conceding that the necessity of an act for the support of the state government in determining whether it is subject to referendum is a judicial question, the inquiry would not extend beyond the scope of judicial knowledge and every reasonable presumption must be indulged in favor of the determination of the necessity of the legislation. In its inherent nature, an inquiry as to necessity upon disputed facts would extend beyond the application of ordinary legal principles, and caution must be exercised that this court may not encroach within the scope of legislative powers. We are convinced that within the contemplation of the referendum provision of the Constitution it is not intended that this court should determine a factual controversy as to the necessity of a statute for the support of the state, upon which minds may reasonably differ, and that this court may substitute its judgment for that of the Legislature.

A contradiction of necessity does not exist upon the face of the act and the companion act appropriating the incomes to be derived from the collection of the tax, and from other facts which

we may judicially notice we cannot say that the act in question is not necessary for the support of the state government and its existing public institutions. As the Supreme Court of Washington in the case of State v. Hinkle, 116 Wash. 1, 198 P. 535, 537, considering the necessity for the enactment of a statute reorganizing the departments of the state government, said: "But to resolve the immediate problem, obviously its intricate and complicated nature requires the exertion and application of an amount of expert knowledge, experience, and judgment, necessarily without the scope of the restricted doctrine of judicial knowledge, and, as we have intimated, properly commanded, only by the Legislature."

The motion to quash the alternative writ of mandamus is therefor granted and demurrer to the complaint is sustained.

POLLEY, J., concurs.

CAMPBELL, J. (concurring specially). The expediency or economic or social wisdom of the gross income tax law or the questions of whether it will make for a more fair and equitable distribution of the tax burden among our citizens, or whether it can or will accomplish the good its proponents predicted, are matters with which this court cannot concern itself. The responsibility for the determination of those questions was assumed by the Legislature which enacted the law and must continue to remain with and rest upon that Legislature. It is entirely conceivable that constitutional objections might be urged (whether successfully or not) against the law as a whole or against various portions or provisions thereof. Cf., for example, Winter v. Barrett (opinion filed May 10, 1933), 352 Ill. 441, 186 N. E. 1131. But no such matters are before this court in the present proceeding.

The sole judicial question now for decision is whether or not this law is "necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions," within the meaning of section 1, art. 3, Const. S. Dak. The statute carries no emergency clause and, in any event, it would hardly be urged that it was necessary for the immediate preservation of the public peace, health, or safety. Our inquiry therefore analyzes down to this: Is the statute necessary for the support of the state government and its existing public institutions within the meaning of the constitutional provision?

I think the word "necessary" in the constitutional provision should not be disregarded. I do no think that the mere facts that the statute is for the support of government and was enacted by the Legislature establish conclusively and beyond possibility of judicial review that the statute was necessary for the support of the state government. I think the result arrived at by this court in State ex rel Wegner v. Pyle, 55 S. D. 269, 226 N. W. 280, was correct, but, after further study and deliberation, I do not now adhere to all the language or reasoning set forth in that opinion. When the Legislature passes an act for the support of the state government or its existing public institutions and the referendum is sought to be invoked thereon, I believe a judicial question is presented as to the necessity of the act. That question should be determined, in my judgment, as stated in State ex rel Wegner v. Pyle, supra, page 277 of 55 S. D., 226 N. W. 280, 283, by considering "the effect upon such support of the delay incident to referring the law and the consequences, if the law is defeated." I believe that this court, in making such determination, ought generally to resolve the question in favor of the necessity of the legislative act unless the contrary quite plainly appears. I think the contrary did very clearly appear in the light of all the facts in State ex rel Wegner v. Pyle. I now think, however, that it was fallacious to assume, as apparently we did assume in the Pyle Case, that the mere presence in the law of a "replacement clause" such as was contained in that law (and such as is contained with reference to the present law in the companion act, chapter 185, Laws 1933) whereby, in substance, the taxing authorities are "specifically directed and required to eliminate or reduce property tax levies to the full extent of the revenues made available by the collection of the tax imposed by said act" is sufficient in every case, and without more, to demonstrate that the act imposing the new tax merely shifts pro tanto the burden of taxation and that government will continue to be supported (as it has been in the past) whether such shift is made or not. At the present time and under present economic conditions, it seems to be entirely possible that, if tax levies upon property are continued at present rates, an appreciable number of property owners may be unable to pay taxes and taxing districts may be unable to realize the necessary amount of revenue from the taxed property either by sale thereof

to others or from income if bid in by the district. On the other hand, if levies on property can be reduced by some other sort of tax, the burden of which may be differently distributed and the incidence of which will be more frequent but will require smaller payments at any one time, its is equally entirely possible that property taxes levied at somewhat lower rates will be paid or realized to an appreciably greater extent. It is possible in the one case that within two years revenues may be or become inadequate for governmental purposes and it is possible in the other case that they may be and continue adequate. I do not say that either of these possibilities would necessarily become actualities, nor can I predict how much, if at all, the operation of the income tax law may improve the situation, but so long as these possibilities exist, as I believe they do exist, I am not willing to hold that there are any facts proper for judicial notice whence this court can declare in this case that "it is plain that the support of government will be unaffected in any manner" by the referendum of the gross income tax law. I do not believe this court can or should say, as a matter of judicial determination, that this law at the present time is not "necessary for the support of the state government and its existing public institutions."

I therefore concur in the view that the act is not subject to the referendum and that the alternative writ of mandamus should be quashed.

RUDOLPH, P. J. (dissenting). This court definitely committed itself to certain principles regarding the referendum in the case of State ex rel Wegner v. Pyle, 55 S. D. 269, 226 N. W. 280. That that case was carefully considered is evidenced by the fact that the decision was by a bare majority of the court with two of the judges concurring in a dissenting opinion. It is my opinion that the Wegner-Pyle Case controls the result of this present case, and I am not now inclined to depart from the principles deliberately established in that case.

The Pyle Case established that if any part of the constitutional provision is to be strictly construed it is the exception, which reads "except such laws as may be necessary for the immediate preservation of the public, peace, health, or safety, support of the state government and its existing public institutions." At the outset,

therefore we may start with the premise that, unless it clearly appears that the law under consideration is necessary for the support of the state government, it does not fall within the exception. The suggestion "that the Legislature by the act of passing the law thereby determined its necessity" was expressly denounced in the Pyle Case.

I can see no valid distinction between the replacement feature contained in the law under consideration in the Pyle Case and the replacement feature contained in chapter 185, Laws of 1933. Speaking of this feature of the law, the majority of the court in the Pyle Case said: "It is an express declaration of legislative intent which unmistakably discloses the purpose of the law and the reason for its enactment. * * * While it is intended to raise revenue, and the support of the government is dependent upon revenue, it does not purport to increase revenues, but expressly provides that it shall not do so."

In this case as in the Pyle Case we have, therefore, the express legislative declaration to the effect that the law is not necessary for the support of the state government. Keeping in mind that it is the exception in the constitutional provision which must be strictly construed and that it must clearly appear that the present law is within the meaning of the exception, is there anything before this court at the present time which will overcome this express legislative declaration contained in section 1 of chapter 185, Laws 1933, to the effect that the law is in fact not necessary for the support of the state government? I am of the opinion that there is not. This court cannot under the guise of judicial notice speculate upon the possibility of there being paid in the future a sufficient amount of general property taxes and other taxes required to be paid to run the state government. The act contains no declaration by the Legislature to the effect that the future collection of taxes, independent of the 1933 law, would be insufficient to meet the needs of government. What effect such legislative declaration would have I do not now in any manner express an opinion. Sufficient to say is, that without such declaration there is nothing before this court which in any manner establishes that payment of future taxes will be insufficient to meet the needs of government. Not only is there an absence in the act of any such declaration as

just referred to, but, on the other hand, we have the express declaration in section 1, chapter 185, above referred to.

I am of the opinion that the writ should be granted.

WARREN, J. Being unable to share in the views stated in the majority opinion, I deem it not only my privilege, but also my duty to briefly note my dissent.

The constitutional provision herein involved is section 1, article 3, of our Constitution, the material part of which reads as follows: "The legislative power of the state shall be vested in a legislature which shall consist of a senate and house of representatives, except that the people expressly reserve to themselves the right to propose measures, which measures the legislature shall enact and submit to a vote of the electors of the state, and also the right to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions. * * * "

Our state pioneered the initiative and referendum. Many states have followed. Considerable criticism has been leveled at the measure and much has been said both for and against it. This court has in previous decisions reviewed the referendum historically and also from the standpoint of its being a safeguard to the people. Nothing will be gained by a review of the judicial decisions, works on economics, views of text-writers and other writers who have thoroughly discussed the merits of the initiative and referendum.

The people of South Dakota have reserved unto themselves certain rights and powers by and through said initiative and referendum except in certain instances and I shall not treat the political wisdom of the powers that the people have reserved unto themselves.

The 1933 Session of the Legislature, after considerable discussion and after quite a struggle, abandoned various proposed tax measures and selected and passed the present gross income tax law by a bare majority.

Chapter 184 of the 1933 South Dakota Session Laws imposes taxes on gross incomes and provides for the levying, assessment,

collection, and distribution thereof, contains certain other provisions, and repeals certain sections of our statutory laws.

Chapter 184 is followed by chapter 185 which is an act expressed in its title as: "Relating to Proceeds Derived from Gross Income Tax. An Act Entitled, An Act Appropriating Money Accruing Through the Taxation of Gross Incomes for Administration Expense and in Aid of Common Schools."

Section 1 of Chapter 185 reads as follows: "It is hereby expressed as the intent of the legislature that the entire income derived from the tax on Gross Incomes imposed by the provisions of Senate Bill No. 101 passed at this session of the legislature and approved by the Governor on ——— 1933, shall, in its distribution and use, operate as a direct relief, replacement and reduction in the tax heretofore, now and hereafter imposed upon and against the taxable property of the state, and the authorities having supervision of the levying of property taxation are specifically directed and required to eliminate or reduce property tax levies to the full extent of the revenues made available by the collection of the tax imposed by said act."

It will be observed that it is mandatory upon the authorities having supervision of the levying of property taxation to specifically eliminate and reduce property tax levies to the full extent of the revenues made available by the collection of the tax imposed by said act of Senate Bill No. 101 which is Chapter 184 of the 1933 Session Laws.

The language used, the references made, and the recital in one specifically naming, numbering, and referring to the other seem to indicate that it was intended to carry out the purpose and to furnish the machinery with which to put the gross income tax statute into operation and to carry out its provisions even unto replacing funds collected through other forms of taxation. In other words, the two chapters should be read and construed together with like force and effect as though Chapter 185 was embodied within Chapter 184. The practically unanimous and announced weight of judicial opinions so hold in construing statutes of similar import. All statutes in pari materia are to be read and construed together as if they formed part of the same statute and were enacted at the same time. The two statutes in question were

enacted by the same Legislature. Chapter 184 being approved March 3, 1933, and Chapter 185 being approved March 6, 1933. "In pari materia. Upon the same matter or subject. Statutes in pari materia are to be construed together." (Bouvier's Law Dictionary.)

Our territorial Supreme Court in an early decision placed such a construction on statutes in Territory ex rel McKinnis v. Hand, 1 Dak. 419, 426 (444), 46 N. W. 685, and our state Supreme Court in Finch et al v. Armstrong, 9 S. D. 255, 68 N. W. 740, followed the same rule. For further authorities upholding the rule see 59 C. J. § 620, page 1042, and cases therein cited, 25 Ruling Case Law § 285, page 1060, and U. S. v. Hemmer, 241 U. S. 379, 36 S. Ct. 659, 60 L. Ed. 1055. The two chapters must be taken and construed together.

The vital question presented is whether or not the petitioners have an inalienable right to have the law referred under section 1 of article 3 of the South Dakota Constitution.

This court in a decision written by the late Judge Burch passing upon Chapter 246 of the 1929 Session Laws providing registry tax on motor vehicles, issuances of certificates of title, and providing for the collection of said tax, in State ex rel Wegner v. Pyle, 55 S. D. 269, 226 N. W. 280, 284, held that the referendum applied. Very little can be added to what was said in that opinion. Practically every matter argued and contended for in the case at bar was considered in Wegner v. Pyle, supra. No reason urged by the defendant in this case has sufficiently impressed me to change the views as expressed in Wegner v. Pyle, and I contend that what was said therein is controlling in the case at bar. The very able arguments and briefs presented by both the learned Attorney General and his assistants and by the learned counsel for the plaintiff are highly appreciated. I appreciate the efforts of counsel, but in view of the fact that this court so thoroughly analyzed and reviewed similar and identical matters in State ex rel Wegner v. Pyle, supra, I feel it unnecessary to further review the facts and law before us.

My attention has been called to the decision of State ex rel Shade v. Coyne, 58 S. D. 493, 237 N. W. 733, 734. A perusal of that case discloses the fact that the statute which was before this

court was a tax measure, but in that case the statute under consideration did not contain any so-called replacement language. The following excerpt from Shade v. Coyne seems at this point pertinent. "It fixes the license fees for every class of motor vehicle that is permitted to operate on the public highways of the state. The aggregate of such license fees is a very considerable amount per annum. While it is true as claimed by the plaintiff that a large portion of this revenue is now being collected under the provisions of existing laws, it is also true that many of the license fees as named in the existing law are materially increased, and some classes of vehicles that are not taxed at all under the existing law are added to the taxable list, so that the law in question may increase the present revenue to a greater or lesser extent, and therefore, in this respect, the law in question is different from chapter 246, Laws of 1929, which upon its face could not increase the revenue already provided for in existing laws, but was intended only to replace revenue then being raised from existing laws. State v. Pyle, 55 S. D. 269, 226 N. W. 280, 283."

From the foregoing it is quite apparent that the case of Shade v. Coyne cannot be held applicable to the matters at issue in this case. In fact that decision points out the existing differences of the matters in controversy in State ex rel Wegner v. Pyle, and clearly shows the distinction between the statutes involved in the two decisions. The case at bar therefore should be governed by what we said in State v. Pyle, supra.

It is fair to assume that the Legislature had in mind the decisions relating to the referendum as expressed in State v. Pyle, supra, and that because of the replacement feature contained in section 1 of chapter 185 the law would be referred to the people for their approval or disapproval consistent with the powers retained by the people by and through the referendum expressed in our Constitution.

There being no language expressing an emergency within the statute, and no emergency clause being attached thereto and it having been passed by a bare majority, and there being a companion chapter, 185, specifically stating that there shall be a replacement and a reduction in the tax heretofore, now and hereafter imposed upon and against the taxable property of the state, I am

unable to agree that it comes within the exception as being necessary for the immediate support of the state government and its existing public institutions.

What we said in State ex rel Wegner v. Pyle, supra, is applicable in this case. In it we said: "We have in the law now before us an express declaration of the Legislature requiring that the revenues now derived by levy upon and taxation of property be reduced in the amount of the revenue derived from the new source. Thus on the face of the enactment its intended effect appears by the Legislature's declaration. We do not have to resort to other proof."

I firmly believe that the people reserved unto themselves by referendum the right to pass upon a measure such as this and that it comes within the purpose of the definition given on page 19 of Vol. 43, September issue, 1912, of Initiative, Referendum & Recall: "The referendum will provide a system by which people can defeat legislation which a majority believe will prove detrimental to public interest." I do not believe that the restriction of the scope of the referendum provision as construed in the majority opinion was contemplated by its framers. The right to have such a law referred is guaranteed by the Constitution. The writ applied for should issue.