C. V. FLOYD FRUIT CO.; MARY C. COOPER, a widow, *et al.,* v. FLORIDA CITRUS COMMISSION and NATHAN MAYO, as Commissioner of Agriculture.

175 So. 248.
Division A.
Opinion Filed May 31, 1937.

*James R. Cooper,* for Appellants;

*E. Glenn Grimes, W. M. Smiley, Doyle E. Carlton* and *Cary D. Landis,* Attorney General, and *James B. Watson,* Assistant, for Appellees.

Buford, J.—The appeal brings for review an order denying injunction and dismissing the bill of complaint.

The bill of complaint was filed by the appellants and sought to enjoin the appellees, defendants in the court below, from collecting the so-called advertising tax on oranges, grapefruit and tangerines from the complainants, and from each of them, and from the complainants, or either of them, to place upon their fruit a stamp tax showing the payment of such advertising tax and from interfering with the complainants or their said fruit, or molesting them in any way in the handling thereof on account of the absence of such stamp or other evidence showing payment of such advertising tax, and for other relief not necessary to be discussed here.

The tax sought to be enjoined was that levied by the Legislature under the provisions of Chapter 16856, Acts of 1935, 3254 (84), 3254 (100) and 3254 (116), Compiled General Laws of Florida, Permanent Supplement, Vol. 3.

Section 6 of the Act, the provisions of which are carried forward in the sections of the Permanent Supplement of C. G. L. herein first above referred to, is "that there is to be levied and imposed until July 1, 1937, an excise tax of one cent on each standard packed box of oranges grown in the State of Florida." Other sections in the Act apply to tax on grapefruit and tangerines, the only difference being in the amount of the tax levied.

Section 10 of Chapter 16856, *supra,* 3254 (104) C. G. L. Permanent Supplement, provides as follows:

"All taxes levied and collected under the provisions of this law shall be paid into the State treasury on or before the 15th day of each month. Such moneys shall be kept in a special fund to be known as the 'grapefruit advertising fund' which is hereby created, and all moneys coming into said special fund are hereby appropriated and made available for defraying the expenses of the administration and enforcement of this law. All money levied and collected under this law over and above the necessary administrative expense as provided for in this law shall be spent exclusively for the advertising of grapefruit as herein provided: Provided, further, that in cases where grapefruit are advertised jointly with tangerines, oranges or both such tangerines and oranges, the grapefruit advertising fund shall only bear its pro rata share of such joint advertising. All taxes levied hereunder and collected through sale of said stamps by the commission shall be paid to the Comptroller of the State of Florida for payment into said grapefruit advertising fund. Funds expended under this law for advertising shall be expended through an established advertising agency within the State of Florida."

Section 11 of the Act provides as follows:

"All costs, expenses and obligations incurred under the provisions of this law shall be paid out of the grapefruit advertising fund upon warrant of the Comptroller when vouchers therefor are exhibited, approved by the commission."

Section 9 of the Act provides as follows:

"All taxes levied and imposed under and pursuant to the provisions of this law shall be due and payable and shall be paid when the grapefruit covered by this law is first handled in the primary channel of trade. All such taxes shall be paid to the commission by the person first handling the grapefruit covered by this law in the primary channel of trade. The payment of such taxes shall be evidenced by

stamps to be known and designated as 'grapefruit advertising stamps,' with the amount paid for such stamps indicated thereon, which stamps shall in every instance be affixed to the grade certificate or certificates showing the grade of the grapefruit covered thereby when such grapefruit is required by law to be inspected for grade and certification thereof, and in all other cases such stamps shall be affixed to the returns provided for in Section 3254 (102). The Comptroller of the State of Florida shall cause to be prepared and delivered to the commission suitable stamps denoting the taxes hereunder levied. The commission shall cause such stamps to be distributed for payment of the taxes prescribed in this law and shall prescribe such method for the affixing and cancellation of said stamps as shall be necessary to carry out and comply with the intent and purpose of this law.

"All revenue laws in the State of Florida relating to the assessment and collection of taxes are hereby extended to and made a part of this law, so far as applicable, for the purpose of collecting taxes on grapefruit omitted through mistake, fraud or other reason."

It is contended by the appellants (1) that the tax levied is a property tax; is not based upon uniform and equal rate of taxation, and contravenes Section 1 of Article IX of the Florida Constitution.

It is next contended (2) that even though the tax be held to be an excise tax, it would contravene Section 1 of the Declaration of Rights of the Florida Constitution because such tax would be a tax assessed upon the right to acquire, possess and protect oranges, grapefruit and tangerines.

It is next contended (3) that thoungh it be held to be an excise tax and not to contravene Section 1 of the Declaration of Rights of the Florida Constitution, yet such tax

would be a burden on interstate commerce and would invade the exclusive legislative field of the Congress.

. It is next contended (4) that the tax contravenes paragraph 5, Section 9, Article I, of the Constitution of the United States.

It is next contended (5) that the tax contravenes Section 1 of Article XIV, of the Federal Constitution in that it violates the equal protection clause and the due process clause of that section of the Constitution.

It is next contended (6) that the tax contravenes Section 12 of the Declaration of Rights of the Florida Constitution inasmuch as such tax would be taxing property without due process of law because the tax is not for a public purpose.

"It is next contended (7) that the tax contravenes Section 5 of Article IX of the Constitution because it is levied for the benefit of the Citrus Commission, a corporation.

The Act here involved is one of a series of legislative Acts passed for the benefit of the citrus fruit industry of Florida, being Chapters 16854 to 16862, both inclusive, of the Session of 1935. These Acts were designed to regulate the marketing of citrus fruit. A Citrus Commission was created and provisions were made for the inspection, grading and processing of citrus fruit to the end that the marketing of immature or unfit fruit may be prevented, and provision was also made for advertising Florida citrus fruit, that the buying public might be informed of the superior quality of citrus fruits being marketed from Florida, that the demand therefor might be increased thereby. To accomplish all this, taxes are levied and collected on a per box basis to be used for the general expense incident to the execution of the provisions of the several Acts. Section 9 of the Act, *supra*, it will be observed, provides: "That all taxes levied and imposed under and pursuant to the provisions of this law shall be due and payable and shall

be paid when the oranges covered by this law are first handled in the primary channel of trade." Other sections make the same application to the tax on grapefruit and tangerines.

These provisions are important because upon these provisions rests largely the determination of the class of the tax.

While the appellant has stated seven contentions, such contentions may be reduced to three questions. The first is, "Is the tax levied a property tax or an excise tax?" The second question is, "Does the tax levied constitute a burden on interstate commerce, or lay an impost or excise duty on the exports?" The third question is, "Is the tax imposed for a public purpose?"

If the tax is an excise tax and is not a tax on the right to protect, possess and acquire property and does not deprive the taxpayers of their property without due process of law, or deny to them the equal protection of the law, then it is valid; provided, of course, it is levied within the legislative power for a public purpose.

The Legislature declared the tax to be an excise tax. It further provided, as heretofore shown:

"All taxes levied and imposed under and pursuant to the provisions of this law shall be due and payable and shall be paid when the oranges covered by this law are first handled in the primary channel of trade. All such taxes shall be paid to the commission by the person first handling the grapefruit covered by this Act in the primary channel of trade.

"Oranges shall be deemed to be delivered into the primary channel of trade when any such oranges are sold, or delivered for shipment, or delivered for canning and/or processing into by-products."

So it is that under the provisions of the Act, it is defined as an excise tax. It is levied on the basis of one cent per box on oranges, three cents per box on grapefruit and five cents per box on tangerines per standard pack box. The tax is payable when the fruit is first delivered into the primary channel of trade. It is to be paid by the handler of such fruit at that time and not before. The primary channel of trade may be by sale, delivery for shipment, or delivery for canning or for processing into by-products. It is a tax upon the privilege of handling fruit, of selling fruit, of delivering fruit for shipping or delivering fruit for canning or processing into by-products. The tax is not levied upon the right of ownership or of production, or of possession.

The case of Thompson v. McLeod, 112 Miss. 383, 73 Sou. 193; and the case of Foster & Creighton Co. v. Graham, 154 Tenn. 412; 285 S. W. 570, are relied upon by the appellant to support their contentions.

In the Thompson case the statute under consideration was as follows:

"Be it enacted by the Legislature of the State of Mississippi, that there is hereby levied on the gross annual cutting or extraction the following annual privilege tax or occupation fee for the year 1912, and for each subsequent year, upon each person, association of persons, or business firms and corporations pursuing the business of extracting turpentine from standing trees.

"That for carrying on the business of extracting turpentine from standing trees the license shall be one-fourth ($\frac{1}{4}$) of one cent each year for each cup on box."

In that opinion it was pointed out:

"The Legislature is here attempting to denominate private use of property as a public use. Appellees, in taking crude gum from his own trees, is not directly engaged in

any kind of mercantile business. He does not bring his wares into the market place nor upon stock markets. He is upon his own private property pursuing a natural right.

" 'A Legislature cannot make a private purpose a public purpose, or draw to itself, or create the power to authorize a tax or a debt for such a purpose, by its mere fiat.' Dodge v. Township, 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242.":

"This case, while different from, falls within the principle announced by our Court in Wilby v. State, 93 Miss. 769, 47 South. 465. At page 772 of 93 Miss. at page 466 of 47 South our Court says:

" 'Laws of this nature approximate an abridgment of the liberty of the citzen guaranteed to him by the Fourteenth Amendment of the Constitution of the United States, and should receive the strictest construction. Liberty, in its broad sense, must consist in the right to follow any of the ordinary callings of life without being trammeled.'

"The Act under review does not undertake to make a distinction between the humble homesteader who taps a few trees by his own home and the large operator of many distilleries. No distinction can in fact be made. The liability here imposed is conclusively fixed at the root of the tree, and not at the market place. The poorest and most humble homesteader in the country might tap a few trees on his 40 acres, load a few barrels of crude turpentine, convey it to the distillery with a one-ox cart and thereby subject himself to liability.

"The conclusion of the whole matter, then, is that this tax operates necessarily and immediately as a property tax and not as a privilege tax, and the statute imposing it violates Section 112 of our Constitution, and the result reached by the learned chancellor is eminently correct, and his decree is accordingly, affirmed."

In the case of Foster & Creighton Co. v. Graham, *supra,* the statute involved provided:

"Be it enacted by the General Assembly of the State of Tennessee that as used in this Act the term 'person' means and includes every individual, firm, association, joint stock company, syndicate and corporation.

"The term 'distributor' means and includes every person who engages in the business in the State of refining, manufacturing, producing or compounding gasoline or distillate, and selling the same in this State; and also every person who engages in the business in this State of shipping, transporting or importing any gasoline into, and making original sales of the same, in this State.

"The term 'dealer' means and includes every person, other than a distributor, who engages in the business in this State, of distributing or selling gasoline or distillate within this State."

Subsequent sections of the Act levied a privilege tax on dealers of two cents for each gallon of gasoline sold or distributed by such dealer in Tennessee. The court held, as is stated by appellant:

"All taxes, other than polls, are either direct or indirect. A direct tax is one that is imposed directly on property according to its value. It is generally spoken of as a property tax, or an *ad valorem* tax. An indirect tax is a tax upon some right or privilege, and it is also called an excise or occupation tax."

The court went on, however, and upheld the validity of the tax, saying:

"The Legislature has unlimited and unrestricted power to tax privileges, and this power may be exercised in any manner or mode in its discretion. Wilson v. State, 143 Tenn. 72, 224 S. S. 168; Jenkins v. Ewin, 8 Heisk. 473; Freidman Bros. v. Mathes, 8 Heisk. 488; Kelly v. Dwyer,

7 Lea 180; Shelton v. Silverfield, 104 Tenn. 71, 56 S. W. 1023; American Steel & Wire Co. v. Speed, 110 Tenn. 547, 75 S. W. 1037, 100 Am. St. Rep. 814; Trentham v. Moore, 111 Tenn. 352, 76 S. W. 904.

"The Act does not violate Article I, Section 8, and Article XI, Section 8, of our Constitution, for the reasons hereinbefore stated. Nor does it violate Article II, Section 17. The general purpose of the provisions of Article II, Section 17, of our Constitution is accomplished when the law has but one general purpose, which is fairly indicated by its title. Wilson v. State, *supra;* Cannon v. Mathes, 8 Heisk. 519; Railroad v. Byrne, 119 Tenn. 278, 104 S. W. 460."

The case of Thompson v. McLeod, *supra,* is stronger authority for sustaining the Act here under consideration than it is for appellants' contention. There the majority of the Court held that the tax imposed was a tax on property and pointed out that, "The Legislature is here attempting to denominate private use of property as a public use. Appellee in taking crude gum from his own trees is not directly engaged in any kind of mercantile business. He does not bring his wares into the market place nor upon the stock market. He is upon his own private property pursuing a natural right."

The statute we have under consideration is materially different. Here the tax is levied upon the privilege of turning the fruit into the channels of commerce. The tax is not based on the value of the fruit, but is based upon the standard box as the unit.

That the tax is an excise tax may be determined by the application of legal principles stated in the case of Jerome H. Sheip Co. v. Amos, 100 Fla. 863, 130 Sou. 699, wherein this Court, speaking through Mr. Justice STRUM, reviewed the authorities and clearly defined the rules by which a statute is to be measured in reaching the determination of

the character of the tax thereby imposed.  It could serve no useful purpose to repeat what was said in that opinion and it would be a vain undertaking for this writer to attempt to add in logic, in reason, or in the citation of supporting authorities, anything to what Mr. Justice STRUM set forth in that opinion.

Holding that the statute levies an excise tax, it follows that the rule of equality and uniformity as guaranteed by Article IX of the Constitution is not involved.  We cannot say that the tax is unreasonable, that it is unjustly discriminatory, nor arbitrary, whimsical, irrational, grossly oppressive, plainly unequal or contrary to common right. Therefore, it is a valid excise tax.  See State, *ex rel*. Bonsteel, v. Allen, 83 Fla. 214, 91 Sou. 104, 26 A. L. R. 735; Jackson v. Neff, 64 Fla. 326, 60 Sou. 350; Peninsula Casualty Co. v. State, 68 Fla. 411, 67 Sou. 165; Amos v. Gunn, 84 Fla. 285, 94 Sou. 615; Amos v. Mathews, 99 Fla. 1, 126 Sou. 308; Jerome H. Sheip Co. v. Amos, *supra;* Gray v. Central Fla. Lbr. Co., 104 Fla. 446, 140 Sou. 325.

The tax being levied by the Legislature as an excise tax within the legislative power, it does not violate either the equal protection of the law, or the due process, clause of the Constitution.

Then we are to consider whether or not the tax constitutes a burden on interstate commerce, or does it lay an impost or excise duty on exports.  The tax is not levied upon an article or commodity which has entered into interstate commerce.  The tax is applied before the commodity enters interstate commerce.  It is elementary that a shipment does not enter into interstate commerce until it is loaded on the car or other conveyance, or otherwise delivered to a carrier, or is assembled for transportation to begin its journey from one state to another.  For the same reason, it is not an export tax because a commodity does not acquire

the character of an export until it is loaded or delivered to a carrier to begin its journey out of the jurisdiction of its origin.

The tax is levied and is payable on the privilege of turning the commodity into the channels of trade, regardless of whether it is later to be entered in interstate commerce or to become an export. The case of Coe v. Errol, 116 Sup. Ct. 517, 29 Law Ed. 715, is in point. That case involved a tax levied on logs at the point of shipment. The logs involved had been floated down river to a place where they were to be shipped in interstate commerce. The tax was questioned on the ground that the logs were in interstate commerce and, therefore, not subject to the tax. In that case the Court said:

"But no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State will indicate the view which seems to us the sound one on that subject, namely: that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another State or have been started upon such transportation in a continuous route or journey. We think that this must be the true rule on the subject. It seems to us untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation."

See also H. Chassanoil v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004, and Agricultural Prorate Commission v. Superior Court, 55 Pac. (2) 495.

And so we hold that the tax is not a burden on interstate commerce and does not lay an impost or excise duty on exports.

Next we consider the question, "Is the tax imposed for a public purpose?" We held in an opinion prepared by Mr. Justice ELLIS in the case of Johnson v. Maxcy, 99 Fla. 1311, 128 Sou. 853, that the protection of the entire citrus industry is a matter within the police power of the State. In that case it was said:

"The protection of a large industry constituting one of the great sources of the State's wealth and therefore directly or indirectly affecting the welfare of so great a portion of the population of the State is affected to such an extent by public interest as to be within the police power of the sovereign."

In Maxcy v. Mayo, 103 Fla. 552, 139 Sou. 121, Mr. Justice WHITFIELD, speaking for the Court, said:

"This Court takes judicial notice of the fact that the citrus industry of Florida is one of the State's greatest assets. Its promotion and protection is of the greatest value to the State, and its advancement redounds greatly to general welfare of the commonwealth."

In Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 Law Ed. 835, the Supreme Court of the United States said:

"We may take judicial notice of the fact that the raising of citrus fruit is one of the great industries of the State of Florida. It was competent for the Legislature to find that it was essential for the success of that industry that its reputation be preserved in other states wherein such fruits find their most extensive market. The protection of the State's reputation in foreign markets with consequent beneficial effect upon a great home industry may have been within the legislative interest and it certainly could not be

said that this legislation has no reasonable relation to accomplishment of that purpose."

So it cannot be reasonably contended that the protection and promotion of the citrus industry in Florida is not a matter of public concern or that the Legislature may not determine within reasonable bounds what is necessary for the protection and expedient for the promotion of that industry. We are committed to the theory that advertising is a proper method for promoting the public welfare and that, therefore, the tax levied to provide funds for advertising serves a public end. Enunciation to this effect is found in the case of City of Jacksonville, et al., v. Oldham, 112 Fla. 502, 150 Sou. 619, in which Mr. Justice WHITFIELD, speaking for the Court, said:

"The statute expressly authorizes the City of Jacksonville to levy and collect annually on all taxable property therein 'a special tax not to exceed one-half of one mill on the dollar of the assessed value of said taxable property for the purpose of providing a fund for the advertising of the said City.'

As the Constitution does not define 'municipal purposes' and does not expressly or by implication forbid such a tax levy as the statute authorizes for the stated purpose; and as proper and effective advertising of the resources, attractions and advantages afforded by the said city to attract prospective settlers and investors to the city cannot fairly be said to have no legal or practical relation whatever to a proper municipal purpose, the determination by the Legislature in enacting the statute that the authorized tax levy is for a municipal purpose, should not be rendered inoperative by the courts, particularly in view of the broad authority that is expressly conferred upon the Legislature with reference to conferring powers upon municipalities by Section 8, Article VIII, of the Constitution."

Of course, it must be conceded that the Legislature could not confer the power on a municipality to levy a tax of a character which the Legislature itself could not levy.

In the case of City of Jacksonville v. Oldham, *supra,* Mr. Chief Justice DAVIS in a special concurring opinion, which was concurred in by the present writer, said:

"The law from time immemorial has recognized the value of advertisements to advertisers, because it has always allowed substantial damages for breach of a contract to insert advertisements, damages for the breach being claimed for the loss of business alleged to have been occasioned by the failure to publish the advertisements contracted for. In constructive service of process, the courts in hundreds of cases depend for their jurisdiction upon the efficacy of advertising giving notice to the world of the pendency of the litigation and thereby affording the constitutionally required due process of law. In fact, it is recorded in history that traders made themselves known and called attention to their products by mural inscriptions on the walls of public buildings long before the age of printing, and it is an historical fact that a papyrus discovered at Thebes reputed to be 3,000 years old, contained an advertisement offering a reward for a runaway slave.

"Economic justification for advertising at *public expense* for public purposes is likewise found in the earliest pages of history. The most noteworthy historical examples of publicly planned and accomplished economic advertising of the industry of a city is disclosed by the sending of state agents from the ancient city of Tyre to imperial Rome to induce Cleopatra to advertise manufactured Tyrian silks by appearing at a great Roman banquet arrayed in thin spun and clinging silken garments, made by the skillful Tyrians, and wondrously colored with the noted Tyrian purple, then

a new luxury. The impression made by this ingenious bit
of public advertising brought about by the commercial fore-
sight of the silk artisans of Tyre, was so indelibly stamped
upon those who were privileged to view the spectacle pre-
sented by the beauteous Cleopatra, that the reputation of
the famous Tyrian silks and the famous Tyrian purple was
not only spread throughout the length and breadth of Rome
in contemporary time, but has become a matter of ineradi-
cable historical significance. And as a result of such ad-
vertising the ancient Phoenician City of Tyre seethed with
commerce for many years resulting from the manufacture
of silk and silken garments and its constant advertising of
them to the world."

The tax here involved is not laid against the privilege of
engaging in one industry for the benefit of those engaging
in another industry, but it is laid on the privilege of putting
citrus fruits into the channels of commerce and is for the
peculiar, though not the exclusive, benefit of those who are
engaged in turning citrus fruits into the channels of com-
merce. It is not exclusively for their benefit because any
activity which redounds to the benefit of those engaged in
marketing citrus fruits in Florida redounds indirectly, to
some extent, to benefit the public generally. Earle v. Dade
County, 92 Fla. 432, 109 So. 331.

The purpose for the levying of the tax and the purpose
for which the tax is appropriated are legitimate. In the
case of McCulloch v. Maryland, 4 Wheat 421, 4 L. Ed. 605,
the United States Supreme Court said:

"Let the end be legitimate, let it be within the scope of
the Constitution, and all means which are appropriate, which
are plainly adapted to that end, which are not prohibited,
but consist with the letter and spirit of the Constitution, are
constitutional."

And in the case of United States v. Butler, 297 U. S. 1,

80 L. Ed. 477, that Court quoted the above paragraph with approval and said:

"The power of taxation, which is expressly granted, may, of course, be adopted as a means to carry into operation another power also expressly granted."

So, we hold that the tax is levied by the Legislature for a public purpose.

For the reasons herein stated, the order appealed from should be and is affirmed.

So ordered.

Affirmed.

ELLIS, C. J., and TERRELL, J., concur.

BROWN and DAVIS, J. J., concur in the opinion and judgment.